JUDGE SEIBEL

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK



| | |
|---|---|
| Gayon Clarke, | Case No._____ cv-(___-___) |
| Plaintiff, | **VERIFIED CIVIL R.I.C.O.** |
| *Standing in propria persona, Sui juris* | **COMPLAINT** |
| | **PURSUANT TO 18 U.S.C. §** |
| -against- | **1964(c)** |

WMC MORTGAGE CORP.;
MORTGAGE ELECTRONICS
REGISTRATION SYSTEMS, INC. (MERS).
AS "NOMINEE" FOR FIRST WMC
MORTGAGE CORP.; GENERAL
ELECTRIC, Parent Company for WMC
MORTGAGE CORP.; MIT LENDING;
GMAC MORTGAGE CORP., OCWENS
LOAN SERVICING LLC, Parent Company
for LITTON LOAN SERVICING;
RESIDENTIAL FUNDING REAL ESTATE
HOLDINGS LLC; RESCAP SECURITIES
HOLDINGS CO.; LOANCARE LLC;
SERVICELINK; ALTISOURCE; STEVEN
J. BAUM P.C., STANLEY E. ESPOSITO,
PITNICK & MARGOLIN, LLP; THE
MARGOLIN & WEINREB LAW GROUP,
LLP; LAW OFFICES OF ALAN WEINREB,
PLLC; FEIN SUCH & CRANE, LLP; RAS
BORISKIN, LLC; DURANTE BOCK &
TOTA, PLLC; JOHN DEMERLE; LUCIA
ANN FILANCIA; and JOHN "DOES" and
JANE "DOES", 1 through 100.
                    Defendant(s).

JURY TRIAL DEMANDED

February 11, 2019

**19 CV 01381**

PRELIMINARY STATEMENT

COMES NOW the Plaintiff, Gayon Clarke, to sue for equitable relief from

damages that the Defendant(s), and each of them, have perpetrated upon Plaintiff

through an unlawful fraudulent interstate enterprise. The Plaintiff hereby sues the

Defendant(s), and each of them, based upon personal firsthand knowledge which has recently come to Plaintiff's attention through her own due diligent research, as to Defendant's own conduct, and upon the basis of newly discovered information and belief as to all other matters. Plaintiff's information and belief is based, among other things, on documents generated by or on behalf of the Defendant(s), and each of them, which reveal the Defendant(s), and each of them, having knowing participation in the fraudulent scheme detailed in this action.

Plaintiff (deeded owner, down payment provider, Mortgage payment remitter and other expenses), has incontrovertible proof that the Defendant(s) have benefitted from the fraudulently appraised Value of the subject properties listed within this Complaint. All Defendant(s) are liable for the fraud and are responsible for their participation as beneficiaries of the Mortgage industry's pattern and practices of doing business as a corrupt influenced racketeering enterprise. The whole American economy has been a victimized by the Banks and Mortgage lenders from this massive egregious financial scheme, and Plaintiff has been personally damaged as a result, and respectfully seeks redress of her grievance in this Court for an equitable remedy of violations of 18 U.S.C. §§ 1964(c), New York State Penal Law § 187 *et. seq*., New York Banking Law Article 2 § 30 (Powers with Respect to Certain and Frauds), and the United States Constitution.

<u>JURISDICTION AND VENUE</u>

i.   There are several sources of subject matter jurisdiction in this Court:

a)   28 U.S.C. §§ 1331 & 1332, for Federal Question and Diversity of Citizenship;

b) 28 U.S.C. § 1337, for Regulation of Commerce, Trade and Amount in Controversy;

c) 28 U.S.C. § 1367, for Supplemental Jurisdiction over claims arising within state jurisdiction that are so related to claims in the action within such original jurisdiction that they form a part of the same case or controversy under Article III of the united States Constitution;

ii. a) 28 U.S.C. § 1391, for Venue Generally where a substantial part of the events or omissions giving rise to this action occurred in this District;

b) This Court also has Venue jurisdiction over the Mortgage fraud conducted in connection to the subject property(s) located in Bronx County;

iii. a) This Court also has original jurisdiction to hear Plaintiff's claim under 18 U.S.C. § 1964(c), for Civil R.I.C.O. violations of law and treble damages in accordance with the decision rendered in the united States Supreme Court in *Tafflin v. Levitt*, 493 U.S. 455 (1990);

b) New York State Penal Law § 187, *et. seq.* – for Mortgage Fraud Criminal Statutes;

c) New York Banking Law Article 2 § 30 - "Consummation of Mortgage Loans" through Supplemental Jurisdiction under 28 U.S.C. § 1367;

d) Article 63 of the Civil Practice Law and Rules (CPLR) – "…to enjoin such unlawful acts or practices and to obtain restitution of any moneys or property obtained directly or indirectly by any such unlawful acts or practices" through Supplemental Jurisdiction under 28 U.S.C. § 1367;

e)    New York State General Business Law § 349 -- for injunctive relief against

deceptive practices through Supplemental Jurisdiction under 28 U.S.C. § 1367.

---

**TO THE HONORABLE COURT**:

   **COMES NOW** the Plaintiff, Gayon Clarke, an unincorporated living soul, and

natural woman on the land, who is neither an enemy of the state, or friend of an

enemy of the state, Standing before the Court *in propria sui juris*, claiming and

declaring the exercise of all unalienable constitutional Rights, respectfully verifiably

states, alleges facts giving rise to causes of action covered under the Constitutions of

the United States and New York  State Republic and provisions of statutory federal

law to seek equitable remedy for the following damages:

## I.   NATURE OF THE ACTION

1.  This is an action for triple damages, costs and attorney fees under 18 U.S.C. §

1964(c) of the federal Racketeer Influenced and Corrupt Organizations Act (R.I.C.O.),

18 U.S.C. §§ 1961-1968, *et. seq.*, arising out of an ongoing pattern of Mortgage Fraud

being conducted by the Defendant(s), and each of them, and other unknown non-party

malfeasants in violation of 18 U.S.C. § 1962(c).

## II.   PARTIES

A.  Plaintiff, Gayon Clarke, is a proper Party American Citizen, who receives mail at

360 East Grand Street, Mount Vernon, New York [10552] Non-Domestic.

B.  Defendant, WMC MORTGAGE CORP., hereinafter "WMC", is a proper Party to

this action is doing business under the laws of the United States of America, who is

also corporate entity "person" that is participating in the fraudulent corrupt enterprise

against Plaintiff's property interests and its last known addresses is 3100 Thornton

Avenue, Office 344, Burbank, CA 91504. Defendant WMC is subprime Mortgage

Lender that is affiliated with Defendant GENERAL ELECTRIC COMPANY and

Plaintiff is informed and believes that this Defendant is in an active Bankruptcy since

May 3, 2018 based upon information published in the National Mortgage News article

by Brad Finkelstein, whose last known address 6320 Canoga Avenue, 10th Floor,

Woodland Hills, CA 91367, and whose listed Record and Return Mortgage address

on the Westchester County Recording and Endorsement database is 1 Ramland Road,

Orangeburg, New York 10962.

C.  Defendant, GENERAL ELECTRIC COMPANY, hereinafter "GE", as the parent

company to Defendant WMC, is a proper Party to this action doing business under the

laws of the United States of America, who is also corporate entity "person" that is

participating in the fraudulent corrupt enterprise against Plaintiff's property interests

and its last known addresses are 3135 Easton Turnpike, Fairfield, CT 06828 and

branch office at 41 Farnsworth Street, Boston MA 02210.

D.  Defendant, MORTGAGE ELECTRONICS REGISTRATION SYSTEMS, INC.,

hereinafter "MERS", as "NOMINEE" for Defendant WMC MORTGAGE CORP., is

a proper Party to this action doing business under the laws of the United States of

America, who is also corporate entity "person" that is participating in the fraudulent

corrupt enterprise against Plaintiff's property interests and its last known address is

1818 Library Street, Suite 300, Reston, VA 20190.

E.  Defendant, GMAC MORTGAGE CORP., hereinafter "GMAC", who is also

corporate entity "person" that is participating in the fraudulent corrupt enterprise

against Plaintiff's property interests is a proper Party to this action doing business under the laws of the United States of America, and its last known address is 100 Witmer Road, Horsham, PA 19044. Defendant GMAC is subprime Mortgage Lender that is affiliated with Defendants RESCAP SECURITIES HOLDINGS CO., GMAC RESIDENTIAL HOLDINGS CO. LLC., GMAC-RFC HOLDING CO. LLC, GMAC MORTGAGE LLC, RESIDENTIAL FUNDING COMPANY LLC, HOMECOMINGS FINANCIAL LLC.  Plaintiff is informed and believes that this Defendant AND its affiliates filed Chapter 11 and became inactive December 17, 2013.

F.   Defendant, MIT LENDING, hereinafter "MIT," who is also corporate entity "person" that is participating in the fraudulent corrupt enterprise against Plaintiff's property interests is a proper Party to this action doing business under the laws of the United States of America, and its last known address is 33 Maiden Lane, 6th Floor, New York, N.Y. 10038.

G.   Defendant, LITTON LOAN SERVICING LP hereinafter "LITTON", who is also corporate entity "person" that is participating in the fraudulent corrupt enterprise against Plaintiff's property interests is a proper Party to this action doing business under the laws of the United States of America, and its last known address is 4828 Loop Central Drive, Suite 151, Houston, TX 77081.

H.   Defendant, OCWENS LOAN SERVICING LLC, hereinafter "OCWENS" as parent company to defendant LITTON; who is also corporate entity "person" that is participating in the fraudulent corrupt enterprise against Plaintiff's property interests is a proper Party to this action doing business under the laws of the United States of

America, and its last known address is 1661 Worthington Road, Suite 100, West Palm Beach, FL 33409.

I.   Defendant, ALTISOURCE PORTFOLIO SOLUTIONS, hereinafter "ASPS" who is also corporate entity "person" that is participating in the fraudulent corrupt enterprise against Plaintiff's property interests is a proper Party to this action doing business under the laws of the United States of America, and its last known address is 1000 Abernathy Road NE, Suite 200, Atlanta, GA 30328.

J.   Defendant, SERVICELINK, hereinafter "SL" who is also corporate entity "person" that is participating in the fraudulent corrupt enterprise against Plaintiff's property interests is a proper Party to this action doing business under the laws of the United States of America, and its last known address is 1355 Cherrington Parkway, Moon Township, PA 15108.

K.   Defendant, RESIDENTIAL FUNDING REAL ESTATE HOLDINGS LLC, hereinafter "RESIDENTIAL", the Party who claims to purportedly have the right to foreclose on Plaintiff's property who is also corporate entity "person" that is participating in the fraudulent corrupt enterprise against Plaintiff's property interests is a proper Party to this action doing business under the laws of the United States of America and its last known address is 2255 N. Ontario Street, Burbank, CA 91504.

L.   Defendant, RESCAP SECURITIES HOLDINGS CO., hereinafter "RESCAP", who is also corporate entity "person" that is participating in the fraudulent corrupt enterprise against Plaintiff's property interests is a proper Party to this action doing business under the laws of the United States of America, and its last known address is

8300 Norman Center Drive, Suite 170, Bloomington, MN 55437 and maintains a

branch office in New York at 225 Liberty Street, New York, NY 10286

M. Defendant, LOANCARE LLC, hereinafter "LOANCARE" who is also corporate

entity "person" that is participating in the fraudulent corrupt enterprise against

Plaintiff's property interests is a proper Party to this action doing business under the

laws of the United States of America, and its last known address is 3637 Sentara Way,

Virginia Beach, VA 23452 and mailing address at P.O. Box 8068, Virginia Beach,

VA 23450.

N. Defendant, STEVEN J. BAUM, P.C., hereinafter "BAUM", is a proper Party to

this action doing business as a Debt Collector Law Firm under the laws of the United

States of America, who is also corporate entity "person" that is participating in the

fraudulent corrupt enterprise against Plaintiff's property interests and its last known

address is 220 Northpointe Parkway, Amherst, NY 14228 and mailing address at

Attn: John DeMerle, P.O. Box 1291, Buffalo, NY 14240-1291.

O. Defendant, STANLEY E. ESPOSITO, hereinafter "ESPOSITO" who is also

corporate entity "person" that is participating in the fraudulent corrupt enterprise

against Plaintiff's property interests is a proper Party to this action doing business

under the laws of the United States of America, and its last known address is 390

Bedford Road, Pleasantville, NY 10570.

P. Defendant, PITNICK & MARGOLIN, LLP, hereinafter "PITNICK", is a proper

Party to this action doing business as a Debt Collector Law Firm under the laws of the

United States of America, who is also corporate entity "person" that is participating in

the fraudulent corrupt enterprise against Plaintiff's property interests and its last known address is 6800 Jericho Turnpike, #206W, Syosset, NY 11791.

Q.  Defendant, The MARGOLIN & WEINREB LAW GROUP, LLP, hereinafter "MARGOLIN", is a proper Party to this action doing business as a Debt Collector Law Firm under the laws of the United States of America, who is also corporate entity "person" that is participating in the fraudulent corrupt enterprise against Plaintiff's property interests and its last known address is 165 Eileen Way, Suite 101, Syosset, New York 11791.

R.  Defendant "LAW OFFICES OF ALAN WEINREB, PLLC", hereinafter "WEINREB", is a proper Party to this action doing business as a Debt Collector Law Firm under the laws of the United States of America, who is also corporate entity "person" that is participating in the fraudulent corrupt enterprise against Plaintiff's property interests and its last known address is 165 Eileen Way, Suite 101, Syosset, New York 11791.

S.  Defendant "FEIN SUCH & CRANE, LLP", hereinafter "FEIN", is a proper Party to this action doing business as a Debt Collector Law Firm under the laws of the United States of America, who is also corporate entity "person" that is participating in the fraudulent corrupt enterprise against Plaintiff's property interests and its last known address is 1400 Old Country Road, Suite C103, Westbury, New York 11590.

T.  Defendant "RAS BORISKIN, LLC", hereinafter "RAS", is a proper Party to this action doing business as a Debt Collector under the laws of the United States of America, who is also corporate entity "person" that is participating in the fraudulent

corrupt enterprise against Plaintiff's property interests and its last known address is 900 Merchants Concourse, Westbury, New York 11590.

U. Defendant "DURANTE BOCK & TOTA, PLLC, hereinafter "DURANTE", is a proper Party to this action doing business a Debt Collector Law Firm under the laws of the United States of America, who is also corporate entity "person" that is participating in the fraudulent corrupt enterprise against Plaintiff's property interests and its last known address is 2000 Maple Hill Street, Suite 206, Yorktown Heights, New York 10598.

V. Defendant, LUCIA ANN FILANCIA, hereinafter "FILANACIA", the Party who claims to purportedly have purchased Plaintiff's property from Defendant , is a proper Party to this action, who stands to be enriched and from the actions of the fraudulent corrupt enterprise against Plaintiff's property interests, and whose a last known address is 6 Kniffen Road, Katonah, NY 10536 and is the Principal for the Agent identified as Defendant "DURANTE", whose place of business is 2000 Maple Hill Street, Yorktown Heights, New York 10598.

W. Defendant(s) JOHN "DOES" and JANE "ROES" 1 through 100 are proper Party(s) to the Complaint, but unknown, and Plaintiff reserves the right to join these Party(s) once they have been identified.

### III. THE R.I.C.O. PERSON

2. Defendant(s), and each of them, are the Successor(s), or Agent(s) in interest to the Party identified as the "Original Lender" for the Mortgage(s) and Promissory Note(s)

dated March 24, 2006 (*See* Exhibit "1", Plaintiff's Mortgage and Promissory Note

with Defendant "Original Lender" in the amount of $572,000.00 and a second

Mortgage and Promissory Note with the same Original Lender on the same

transactional date in the amount of $143,000.00 respectively for a total of

$715,000.00. (*See* Exhibit "1A", the Plaintiff' second  respective Mortgage and Note

for her equitable interest for the subject property).

3.   Defendant(s), and each of them, have assumed legal rights, duties and liabilities

that run with the respective Mortgages Promissory Notes.

4.   Defendant(s), and each of them, fraudulently misrepresented the Value of the

subject property(s) and misrepresented the Loan to Fair Market Value Ratio based

upon a false and inflated appraisal overstating the property value, conducted as part of

a pattern of racketeering activity by the non-party malfeasants. (*See* Exhibit "2",

General Data, Notice of Property Value, Final Assessment Roll for the County of

Westchester for Plaintiff's subject property located at 360 East Grand Street, Mt.

Vernon, New York 10552. Plaintiff's subject property located at these addresses dated

for the year 2006 respectively).

IV. <u>STATEMENT REGARDING LOAN DEFINITIONS</u>

5.   Within the Mortgage Lending Industry, the term "Prime" Loan means a safe

Mortgage Loan to a Borrower who is regarding as being highly creditworthy, has no

obvious financial difficulties and a good payment record, and is therefore very likely

to repay the loan. Fannie Mae, which is the largest secondary market buyer of

Mortgage Loans, established the "Prime" standard for Loan underwriting. "Subprime"

Loan (also referred to as Near-Prime, Non-Prime, and second-chance lending) means

a Mortgage Loan to a Borrower who may have difficulty maintaining the repayment schedule. "Alt-A" (short for Alternative A-paper) means a type of Mortgage Loan that is considered riskier that A-paper, or "Prime", and less risky than "Subprime". Typically, Subprime and Alt-A Mortgages are characterized by Borrowers with less than full documentation, lower Credit Scores, higher Loan to Fair Market Value Ratios, and more investment properties. A "Predatory" Loan is one that is lent based on the Borrower's alleged equity in the property, not on the Borrower's ability to repay the Loan, when in fact, the Borrower's equity is fictional and based on an inflated appraisal overstating the property value. A "Liar's Loan" is a type of predatory Loan.

6.  "Alt-A Loans. Another type of common Loan during the years leading up to the financial crisis was the "Alt-A" Loan. Alt-A Loans were issued to Borrowers with relatively good Credit histories, but with aggressive underwriting that increased the risk of the Loan. The resulting high Loan-to-Value Ratio, and the lack of Borrower equity in the home, meant that, if the Borrower defaulted and the home had to be sold, the sale proceeds were unlikely to be sufficient to repay both Loans. For example, Alt-A Loans often allowed Borrowers to obtain 100% financing of their homes, to have an unusually high debt to income ratio, or submit limited or even no documentation to establish their income levels. Alt-A Loans were sometimes referred to as "Low Doc" or "No Doc" Loans. They were originally developed for self-employed individuals who could not easily establish their income by producing a traditional W-2 Tax Return Form or pay stubs, and so were allowed to submit "alternative" documentation to establish their income or assets, such as bank

statements. The reasoning was that other underwriting criteria could be used to ensure that Alt-A Loans would be repaid, such as selecting only Borrowers with a high Credit score or with a property appraisal showing the home had substantial Value in excess of the Loan amount. (*See* "WALL STREET AND THE FINANCIAL CRISIS: *Anatomy of a Financial Collapse*", United States Senate Staff Report, April 13, 2011, pages 23-24; and "Evaluation of Federal Regulatory Oversight of Washington Mutual Bank", prepared by the Offices of the Inspector General at the Department of the Treasury and Federal Deposit Insurance Corporation, 4/2010).

## V. THE R.I.C.O. ENTERPRISE

7.  The "Liar's Loan Enterprise" consists of the hundreds of entities making up the national Subprime Mortgage Industry, whose top executives operated these companies as control frauds (a financial weapon against society) by rigging financial incentives within the industry to reward a nationwide pattern of brokering, originating, bundling as Securities, selling into the Secondary Market, Servicing, and foreclosing on what the industry insiders dubbed as "Liar's Loans", which are stated income Mortgage Loans mad with no income verification, little or no documentation, no underwriting, a false and inflated appraisal overstating the Value of the property, and an understated Loan-to-Fair Market-Value-Ratio. The Liar's Loan Enterprise is a subject of Public Interest of the national Mortgage Lending Industry. (*See* "Public Policy Issues Raised by the Report of the Lehman Bankruptcy Examiner: *Hearing before the Committee on Financial Services*, United States House of Representatives", statement of William K. Black, April 20, 2010; "*Testimony Before the Financial Crisis Commission*", Miami Florida, statement of William K. Black,

Associate Professor of Economics and Law, September 21, 2010; "*Neo-classical*

*Economic Theories, Methodology and Praxis Optimize Criminogenic Environments*

*and Produce Recurrent, Intensifying Crises*", Creighton Law Review, 2010; and

"*Lenders Put the Lie's in Liar's Loans and Bear the Principal Moral Culpability*",

New Economic Perspectives, October 2011).

8.   The Non-Party malfeasants consist of:

a) the top Subprime Mortgage Originators;

b) the top Subprime Mortgage-Backed Securities Issuers;

c) the top Subprime Mortgage Servicers; the national appraisal

   management companies;

d) the nationwide network of Subprime Mortgage Brokers;

e) certain Non-Agency and Agency Institutional Investors; and

f) the Federal Reserve Bank Chairmen, Alan Greenspan and Ben   Bernanke; who all

played a significant role in the creation of millions of Liar's Loans originated

nationwide between the years 2001 and 2008.

9.   The top Subprime Mortgage Originators include, but are not limited to:

a) HSBC,

b) NEW CENTURY FINANCIAL,

c) COUNTRYWIDE,

d) CITIGROUP,

e) BANK OF AMERICA

f) WMC MORTGAGE,

g) FREMONT,

h) AMERIQUEST MORTGAGE,

i) OPTION ONE,

j) WELLS FARGO,

k) FIRST FRANKLIN,

l) LaSALLE BANK,

m) JP MORGAN CHASE,

n) DITECH,

o) AMERICAN BROKERS CONDUIT,

p) GMAC,

q) M&T BANK, *etc.* (*See* "*UNDERSTANDING THE SECURITIZATION OF SUBPRIME MORTGAGE CREDIT*", Federal Reserve Bank of New York, 2007).

10. The top Subprime Mortgage-Backed Securities Issuers include, but are not limited to:

a) COUNTRYWIDE,

b) NEW CENTURY,

c) OPTION ONE,

d) FREMONT,

e) WASHINGTON MUTUAL,

f) FIRST FRANKLIN,

g) RESIDENTIAL FUNDING CORP.,

h) LEHMAN BROTHERS,

i) WMC MORTGAGE,

j) AMERIQUEST, *etc.*

11. The top Subprime Mortgage Servicers include, but are not limited to:

a) COUNTRYWIDE,

b) JP MORGAN CHASE,

c) CITIGROUP,

d) OPTION ONE,

e) AMERIQUEST,

f) OCWEN FINANCIAL CORP.,

g) WELLS FARGO,

h) HOMECOMINGS FINANCIAL,

i) HSBC,

j) BAYVIEW

k) LITTON LOAN SERVICING,

l) SPECIALIZED LOAN SERVICING,

m) CARRINGTON LOAN SERVICING,

n) AURORA LOAN SERVICES, *etc*.

12. The national appraisal management companies include, but are not limited to:

a) LANDSAFE (owned by BANK OF AMERICA/COUNTRYWIDE),

b) FINITI (owned by CITIGROUP and FIRST AMERICAN REAL ESTATE

(FARES)),

c) RELS (owned by WELLS FARGO and FARES),

d) eAppraiseIT (owned by JP MORGAN CHASE/WASHINGTON MUTUAL and

FARES),

e) Quantrix (owned by JP MORGAN CHASE),

f) LENDERS SERVICES (LSI) (owned by JP MORGAN CHASE/WASHINGTON MUTUAL, FIDELITY, LSI SERVICE LINK, CHICAGO TITLE, LAWYERS TITLE, COMMONWEALTH TITLE and LAND AMERICA),

g) VELOCITY, FISERVE, and AMCO (Valuation Services, LLC), *etc*. (*See* "*HVCC Mandates Decreased Market Competition and Increased Pricing*, (diagram), http://tampaappraisalmanagement.com/wp-content/uploads/2010/0803-AMC-Joint-Venture-Diagram-FINAL.pdf).

13. The top Non-Agency and Agency Mortgage-Backed Securities Investors include, but are not limited to:

a)   COUNTRYWIDE;

b)   LEHMAN BROTHERS;

c)   WELLS FARGO;

d)   WASHINGTON MUTUAL;

e)   BEAR STEARNS;

f)   JP MORGAN CHASE;

g)   DEUTSCHE BANK;

h)   GMAC-RFC

i)   MERRILL LYNCH;

j)   MORGAN STANLEY;

k)   CREDIT SUISSE;

l)   FEDERAL NATIONAL MORTGAGE ASSOCIATION (FNMA);

m)  FEDERAL HOME LOAN MORTGAGE CORPORATION (FHLMC);

n)   GOVERNMENT NATIONAL MORTGAGE ASSOCIATION (GNMA).

14.  Between the years 1997 and 2010, large national consumer lending institutions and their network of Mortgage Brokers who were involved in Subprime and Alt-A lending engaged in an unscrupulous pattern of making shoddy Mortgage Loans with inflated appraisals. The most pernicious variety of these Subprime and Alt-A Loans were what Industry Insiders dubbed "Liar's Loans". The most salient features of a Liar's Loan are no income verification, no documentation, no consideration of the Borrower's ability to repay, and a false and inflated appraisal.

15. This new paradigm within the Mortgage Industry of making intentionally bad Loans for profit was born out of the so-called "Securitization" of Consumer Debt. (*See "Securitized Total Consumer Loans*", Board of Governors of the Federal Reserve System, graph - http://research.stlouisfed.org.fred2/series/TOTALSEC. The graph shows a steady rise in Securitization of Consumer Loans on a nationwide basis beginning about 1990, and a hard climb starting in about 1995, reaching a peak in about 2008 before taking a near vertical dive at the end of 2009).

16.  The process of Securitization involved the pooling together of Mortgage Loans by the hundreds for quick profits. Instead of having to wait around for homeowners to make their Mortgage payments month-by-month, year-by-year, Lenders could immediately turn the Loans into cash by selling the Loans for use in Securities deals. The rapid turnaround allowed Lenders without much Capital of their own to make more Loans and dramatically increase their volume of Lending. Before Securitization, Lenders had either held on to their Loans, collecting payments until the homeowners owned their houses free and clear, or sold them one by one or in groups on the "Secondary Market" to Investors, who took over the right to collect on the Loans.

This tended to limit the ability of Lenders to increase their Loan Volume. They either had to entice Customer to deposit savings in the Bank to Bankroll Loans, or they had to go through the paperwork-heavy process of selling Loans on the Secondary Market. (*See* Michael W. Hudson, "*The Monster: How a Gang of Predatory Lenders and Wall Street Bankers Fleeced America—and Spawned a Global Crisis,*" pgs. 26-27 [2010]).

17.   Securitization of Consumer Debt provided a fertile ground for unscrupulous corporate executives to operate their Mortgage lending institutions as control frauds (a financial weapon against society). These executives developed an "originate and sell" paradigm in consumer lending which allowed them to streamline their focus on making enormous compensation through volume, and to forget Loan quality altogether.

18.   These top lending industry executives operated their companies as control frauds by rigging financial incentives to provide the greatest economic rewards to their staff and to Brokers for generating the highest quality of Loans possible, and to substantially penalize anyone who did not go along with the scheme by either reducing their pay or terminating their employment.

19.   The originators of Liar's Loans knew (or through the exercise of reasonable care should have known) that these Loans were statistically probable to result in Mortgage defaults and foreclosure.

VI. STATEMENT REGARDING UNDERWRITING GUIDELINES

20.   Mortgage Loan underwriting guidelines are intended to assess the creditworthiness of the Borrower, the ability of the Borrower to repay the Loan, and

the adequacy of the Mortgaged property as security for the Loan. The normal parameter considered when underwriting are the amount of the Loan, the Borrower's income, Debt and Credit history, savings and Debt-to-Income Ratio, together with the appraised Value of the property, and the Loan-to-Fair Market Value Ratio.

21.   "Fannie Mae views Lenders as our partners in ensuring the continued viability of the residential lending market and the continued availability of affordable Mortgage financing for home purchases and refinancing. We rely on lenders to make underwriting decisions that result in 'investment quality' Loans; that is, Loans for which it has been established that there is a reasonable expectation that the Borrower is able and willing to repay the Mortgage debt and that the property constitutes sufficient security for the Mortgage. In turn, lenders rely on appraisers to provide them with thorough, accurate and objective appraisal reports that result in reliable opinions of Market Value, so they can make prudent underwriting decisions. The appraisal is used to judge the property's acceptability for the Mortgage Loan requested in view of its Value and Marketability.

The underwriter will use the information provided in the appraisal report, along with other data, to determine whether the property meets FannieMae's requirements for an investment quality Loan. **FannieMae expects the lender to place as much emphasis on underwriting the property and reviewing the appraisal as on underwriting the Borrower's worthiness**.

Therefore, it is important for the appraiser to provide the lender with a reliable opinion of the market Value of the property with the adequate and accurate data

supporting the conclusions of the appraisal report. (*Also See*, the "*Guide to Underwriting with DU*", FannieMae, July 2005, Chapter 6: "Quality Assurance for DU Loans", pg. 198), which states: "The lender must verify data integrity by checking the information provided on the Loan Application, the Closing Documents, and all data analyzed by DU. The data includes, but is not limited to, the Borrower's name and Social Security Number, property address, property type, Mortgage Term, Mortgage type, Loan purpose, Loan amount, LTV, CLTV, employment, income, assets, liabilities, Section VII, and Section VIII."

22.  The appraisal the is requisite to computing the LTV Ratio or CLTV Ratio (Combined Loan-to-Value Ratio) and verifying the data integrity in a Loan Application MUST COMPLY with the Uniform Standards of Professional Appraisal Practice. (*See* "*Appraisal and Property Report Policies and Forms Frequently Asked Questions (FAQ's)*", FannieMae, March 2009, pg. 1, which states: "FannieMae recognizes the Uniform Standards of Professional Appraisal Practice as the minimum appraisal standards for the appraisal industry, and also establishes separate appraisal requirements to supplement the Uniform Standards."

VII.      STATEMENT REGARDING REAL ESTATE APPRAISALS

23.  Title 12 United States Code – "Banks and Banking", regulates the national Mortgage lending Industry and requires a lender to order an appraisal of the property prior to originating a Mortgage Loan securing a Lien against the property, whenever the transaction is federally related (involving an entity or activity regulated by a federal Agency) or connected to Mortgage-Backed Securities. (*See* 12 U.S.C. § 3342, "Transactions Requiring the Services of State Certified Appraiser"; 12 U.S.C. § 3343,

"Transactions Requiring the Services of State Licensed Appraiser", 12 U.S.C. §

3350(4), "Federally Related Transaction", and 12 U.S.C. § 3350(5), "Real Estate

Related Finance Transaction).

24.  The Financial Institutions Reform, Recovery and Enforcement Act of 1989

(FIRREA), Pub. L. 101-73, 103 Stat. 183, enacted August 9, 1989, is a United States

federal law enacted in the wake of the Savings and Loan Crisis of the 1980's. Title XI

of FIRREA (12 U.S.C. §§ 3331-3351) created an oversight structure for appraisers

that involves State, federal and private entities.

25.  FIRREA requires real property appraisals to comply with the Uniform Standards

of Professional Appraisal Practice (USPAP).

26.  The USPAP requires Appraisers to conduct their appraisals independently. (*See*

12 C.F.R. § 225.65(a), Appraiser Independence).

27.  The Appraiser's role is to provide an objective, unbiased opinion of Value to the

lender. (*See* 12 C.F.R. § 225.62(a): which states, "Definitions – a) *Appraisal* means a

written statement independently and impartially prepared by a qualified Appraiser

setting forth an opinion as to the Market Value of an adequately described property as

of a specific date(s), supported by the presentation and analysis of relevant Market

information."

28.  The Appraiser works for the lender, not the owner, buyer or seller, even if one of

them pays for the appraisal.

29.  The Office of Thrift Supervision (OTS) has uncovered many instances of

improper appraisals. After reviewing hundreds of Loan Files, the OTS Appraisal

expert found that "numerous instances were identified where, because of undue

influence on the Appraiser, values [of property] were increased without supporting documentation. OTS had also found that violations of the Agency's Appraisal Regulations to comply with Appraisal independence were rampant in the financial industry, and their investigation had concluded that many lenders influenced Appraiser practices that constituted "unsafe or unsound banking practices".

30.  Plaintiff has reason to believe that the OTS's findings that the practice of violating the Uniform Standards of Professional Appraisal Practice (USPAP) is a form of Corrupt Enterprise and the financial industry pattern and practice of violating these standards are actionable under R.I.C.O.

31.  The Loan-to-Fair Market Value Ratio of a Mortgage Loan, or LTV, is the Ratio of the balance of the Mortgage Loan to Value of the mortgaged property when the Loan is made.

32. The LTV Ratio is among the most important measure of a Mortgage Loan, and thus, it is one of the most important indicators of the default risk of the Mortgage Loan. The lower the Ratio, the less likely that a decline in the Value of the property will wipe out the owner's equity. The lower the LTV, the greater the "equity cushion". The higher the LTV, the greater the risk of Loan Default and Mortgage foreclosure.

33. Thus, the LTV Ratio is a material consideration to a reasonable lender or Borrower in deciding whether to contract for a Mortgage Loan.

VIII.          THE STATUTE OF LIMITATIONS

34.  "Injury Discovery" is the default method of statute of limitations accrual in many federal actions, including R.I.C.O. (*See Pacific Harbor Inc. v. Barnett Bank, N.A.*,

252 F. 3d 1246, 11th Cir., 2001; citing *Rotella v. Wood*, 528 U.S. 549, [2000]), stating: "The Statute of Limitations. We assume, without needing to decide, that the statute of limitations period starts from the date of discovery of the injury. Under the injury discovery rule, unless tolled, the statute of limitations under R.I.C.O. is four years from the date the Plaintiff knew it was injured. (*Rotella*, 528 U.S. 549, 552-53; 120 S. Ct. 1075; 145 L. Ed. 2d 1047, [2000]).

35.  Under the discovery rule, an action accrues on the earlier of the date on which the actionable injury in fact is discovered or should have been discovered by exercise of reasonable diligence. The accrual date triggers the period of limitations, which is four (4) years from the date the Plaintiff knew he or she was injured. In other words, the statute of limitations is suspended or "tolled" until the Plaintiff knows that he or she has an actionable injury in fact, and the has four years to file suit.

36.  Plaintiff's actual injury of fact accrued on March 24, 2006. The first accrual date is for Plaintiff's property located at 360 East Grand Street, Mt. Vernon, New York [10552].

37.  Plaintiff (deeded owner, co-borrower, down payment provider, Mortgage payment remitter and other expenses of equitable interest),  learned of the facts about the misrepresentation of the Appraisal of the property after doing some research about the subject matter of this Complaint on **January 18, 2019**.

38.  This suit is timely filed within the four-year statute of limitations starting from the date that Plaintiff knew in fact that he was injured.

VII. STATEMENT REGARDING STATUTE OF LIMITATIONS

39.  Under Article III of the united States Constitution, a Plaintiff must have sustained some injury in fact in order to have a justiciable "case or controversy", *i.e.*, in order to have Standing and jurisdiction to bring a suit in federal Court. The Supreme Court has stated, in defining what sometimes is referred to as a "Lujan Injury", that "over the years, our cases have established that the irreducible constitutional minimum of Standing contains three (3) elements." A Plaintiff must show that (1) he has suffered or is in imminent danger of suffering an actual, concrete injury, (2) proximately cause by the [mis]conduct of the Defendant, and (3) that the Court has jurisdiction over the parties and issues necessary to redress the injury. (U.S. CONST. Art. III, § 2; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 [1992]; *see also Massachusetts v. Mellon*, 262 U.S. 447, 488 [1923]).

40.  In order to file a federal R.I.C.O. action, injuries must be non-speculative (actual) and calculable (concrete). (*See McLauglin v. Am. Tobacco Co.*, 522 F. 3d 215A [2d. Cir. 2008], holding that Plaintiff asserting a Civil R.I.C.O. claim for injury to business or property must allege actual, quantifiable injury; *Mendoza v. Zirkle Fruit Co.*, 301 F. 3d 1163 [9th Cir. 2002], stating that legally documented agricultural laborers have Standing to bring R.I.C.O. action since laborers alleged concrete, actual injury in form of lost wages, and award of money damages would redress such injury; *Pik-Coal Co. v. Big Rivers Elec. Corp.*, 200 F. 3d 884 [6th Cir. 2000], stating that Plaintiff must plead and prove an actual injury to its business or property by reason of Defendant's R.I.C.O. transgression; *Imagineering, Inc. v. Kiewit Pacific Co.*, 976 F. 2d 1303 [9th Cir. 1992], stating that not all R.I.C.O. injuries are compensable thereunder; showing

of "injury" requires proof of concrete financial loss; *certiori* denied, 507 U.S. 1004 [1993]).

41. An actionable injury denotes far more than a mere harm or loss. Black's Law Dictionary defines an injury as: "The violation of another's legal right, for which the law provides a remedy; a wrong or injustice…Authorities distinguish harm from injury, holding that while harm denotes any personal loss or detriment, injury involves an actionable invasion of a legally protected interest. (8[th] Edition, 2004).

42. Since a concrete, non-speculative injury is required for Standing to file a R.I.C.O. claim, such an injury must also be required to trigger the running of the Statute of Limitations. This was exactly the point the Second Circuit correctly attributed to the Supreme Court, "until such injury occurs, there is no right to sue for damages under § 1964(c), and until there is a right to sue under § 1964(c), a Civil R.I.C.O. action cannot be held to have accrued." (*Bankers Trust Co. v. Rhoades*, 859 F. 2d 1096, 1103 [2d Cir. 1988], quoting *Sedima, S.P.R.L. v. Imrex Co*. 473 U.S. 479, 496 [1985]).

43. The Eleventh Circuit has designated two distinct Time Points for determining injury discovery accrual: "Inquiry Notice" and a "Period of Reasonable Diligence". Time Point #1:

"Inquiry Notice is 'the term used for knowledge of the facts that would lead a reasonable person to begin investigating the possibility that his legal rights had been infringed.'"

Time Point #2:

"Once Inquiry Notice occurs, a prospective Plaintiff enters a period of reasonable diligence, which is the time necessary, exercising ordinary investigation, to ascertain sufficient facts to file a complaint."

44. "In turn, Inquiry Notice triggers reasonable diligence in investigating the fraud for which notice has been received in order to obtain sufficient information to file suit." (*See Tello v. Dean Witter Reynolds, Inc.*, 410 F 3d 1275, 1283 [11th Cir. 2005] and *Tello v. Dean Witter Reynolds, Inc.*, 494 F. 3d 956, 968 [11th Cir. 2007], "Inquiry Notice in our Circuit occurs when there is a factual evidence of the possibility of Securities Fraud that would cause a reasonable person to investigate whether his or her legal rights had been infringed."

45. In discussing Time Point #2 above, the Eleventh Circuit referenced the beginning of a "Period of Reasonable Diligence." This "Period of Reasonable Diligence" begins upon "Inquiry Notice" *i.e.*, when a "reasonable person" should have been aware of "storm warnings." The "Period of Reasonable Diligence" ends upon "Injury Discovery Accrual," *i.e.*, when a "reasonable person" should have discovered "sufficient facts to file a complaint."

46. In *Tello I*, the Eleventh Circuit remanded the case to the District Court to hold hearings to specifically identify the "what" and the "when" of these two essential Time Points. (*See Tello I*, 410 F. 3d at 1294).

"We remand this case to the District Court to determine the essential, preliminary factual issues that we need to proceed with a legal determination of the applicable statute of limitations:

(1) What established Inquiry Notice to the Plaintiff class, and when did that occur? And

(2) When did the Plaintiff class have sufficient information to file suit?

47. The Eleventh Circuit coined the term "Inquiry-Notice" analysis. By hyphenating the term of "Inquiry-Notice", the Eleventh Circuit reflected the same two-part analysis shown in the foregoing "Injury Discovery Accrual Formula." The hyphenation separates the (1) duty of inquiry from (2) notice or discovery of information needed to file suit.

"We conducted our Inquiry-Notice analysis by explaining that 'the task for the District Judge on remand will be to determine the point in time when the Plaintiff Class had sufficient information of the alleged fraudulent Securities conduct by Dean Witter to file this Class Action.' We stated the two questions that we wanted answered on limited remand: (1) What established Inquiry-Notice [storm warnings] to the Plaintiff Class, and when did that occur? And (2) When did the Plaintiff Class have sufficient information to file suit [injury discovery]?" (*Tello II*, 494 F. 3d at 968, quoting *Tello I*, 410 F. 3e at 1294).

48. The Sixth Circuit stated, consistently with the Eleventh Circuit's more recent holdings in *Tello I* and *Tello II*, "Defendant suggests that the limitations period is triggered when the Plaintiff learns facts that would cause a reasonable Plaintiff to investigate the possibility of fraud. Some cases support that suggestion. (*See, e.g. Theoharous*, 256 F. 3d at 1228). The majority view, however, is that knowledge of suspicious facts – "storm warnings", they are frequently called – merely triggers a duty to investigate, and that the limitation period begins to run only when a

reasonably diligent investigation would have discovered the fraud. (*See New England Health Care Employees Pension Fund v. Ernst & Young*, 336 F. 3d 495, 501 [6th Cir. 2003]).

49. Since "Inquiry Notice", (Time Point #1 in the formula above) has historically referenced that point in time when a "duty of inquiry" arises based on the objective "reasonable person" test, it should retain only that moniker. The second essential point in time (Time Point #2 in the formula above) is in fact the time, based on the objective "reasonable person" test an actionable injury in fact should have been discovered under "injury discovery" principles. This latter point in time, when the claim accrues, and the statute of limitations begins to run, is the principal focal point. However, to determine the time the claim accrues based on an objective reasonable person test, it is equally essential to pinpoint that time when the "reasonable person" first had a duty to initiate diligent inquiries, i.e. "Inquiry Notice." (*See Law v. Medco Research, Inc.*, 113 F. 3d 781, 785 [7th Cir. 1997], *Tello v. Dean Witter Reynolds, Inc.*, F. 3d 1275, 1283 [11th Cir. 2005]).

50. *Tello I* and *Tello II* also specified facts which must be determined in the trial Court, preferably by a jury. First, the trier of fact must identify the proximate point in time that a reasonable person should have discovered "storm warnings" or should have become suspicious and must identify "what" would have cause a reasonable person to make such a discovery. Second, the trier of fact must identify the proximate time a reasonable person should have discovered his/her injury in fact and identified "what" would have caused a reasonable person to make such a discovery.

51. By combining the terminology and holdings of the Seventh and Eleventh Circuits, one can arrive at a clear and manageable formula to determine when a cause of action accrues. "Storm warnings" trigger the Period of Reasonable Diligence." This "Period of Reasonable Diligence" ends when a reasonable person should have discovered (or the Plaintiff actually discovers at an earlier date) his/her injuries, regardless of whether inquiries were actually made. The statute of limitations begins to run only when the "Period of Reasonable Diligence" has culminated upon actual or constructive injury discovery.

52. This formula helps a Plaintiff determine what must be discovered and when it must be discovered. The *de facto* tolling principles and application of the reasonable person standard also ensure that valid claims will not be time-barred due to circumstances beyond a Plaintiff's control.

53. Equitable and estoppel tolling principles are uniformly applicable in federal cases to prevent running of the statute when essential facts are concealed from Plaintiff, whether or not the concealment is fraudulent. As stated by the U.S. Supreme Court in *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gibertson*, 111 S. Ct. 2773; 501 U.S. 350, 363-64 [1991], quoting *Bailey v. Glover*, 21 Wall. 342, 348 [1874], stating: "time requirements in law suits…are customarily subject to 'equitable tolling'. (*Irwin v. Veterans Administration*, 498 U.S. 89 (slip op. 5) [1990], citing *Hallstrom v. Tillamook County*, 493 U.S. 20 (slip op. 6) [1989]. Thus, this Court has said that in the usual case, "where the party injured by the fraud remains in ignorance of it without any fault or want of diligence or care on his part, the bar of the statute does not begin to run until the fraud is discovered, though there be no special

circumstances of efforts on the part of the party committing the fraud to conceal it

from the knowledge of the other party." [*i.e.*, even with no fraudulent concealment]

*Bailey v. Glover*, 21 Wall. 342, 348 [1874], *see also Holmberg v. Armbrecht*, 327

U.S. 392, 396-397 [1946]).

54.  Thus, the statute of limitations does not run while the Plaintiff is unaware of the

fact of the fraud upon his rights, *i.e.*, unaware of his "injury by the fraud." Equitable

tolling of the statute continues even after "Inquiry Notice," *i.e.*, even after a

"reasonable person" of ordinary intelligence would be able to discover essential facts

necessary to file suit. After the essential facts necessary to file suit are discovered or

should have been discovered, equitable tolling ceases and Plaintiff has the full

statutory period in which to file suit. (*See TRW, Inc. v. Andrews,* 534 U.S. 19, 30

[2001], discussing the "reasonable person" and the triggering of the limitations period

in the context of an alleged violation of the Fair Credit Reporting Act (FCRA)).

55.  Thus, the point in time when equitable tolling ceases – *i.e.*, when the facts needed

to file suit are discovered or discoverable – is the same point in time when a statute

runs under "injury discovery" accrual principles.

56.  During the years 2005 through 2011, millions of objectively reasonable

Americans, including Plaintiff, became aware through the Internet and mainstream

media news of the Housing Bubble and its collapse, and the resulting harm to

Americans nationwide, including millions of homeowner experiencing the loss of

equity in their home to the point that they owed more on their Mortgage than their

property was worth; and the Economic Crisis with hundreds of Bank and Mortgage

Lender failures with thousands of Investors losing their investments in Mortgage-

Backed Securities schemes, and thousands of small business failures with millions of worker experiencing the loss of their jobs resulting in large-scale unemployment; and the Mortgage crisis continues with millions of homeowners losing their homes through fraudulent Mortgage foreclosures. These financial industry fraudulent practices are actionable because they constitute an actual harm and the fact that the Defendant(s), and each of them, are among the financial institutions engaged in the enterprise of fraudulently misrepresenting the appraisal values of Plaintiff's homes, these fraudulent practices also constitute an actual injury.

57.    During the years 2008 through 2011 millions of objectively reasonable Americans, including Plaintiff, became aware, through the Internet, and through mainstream media news of thousands of foreclosure cases clogging the Courts; thousands of "lost Note" cases; widespread confusion among homeowners as to who is the actual owner of their Mortgage Loan; and the widespread use by Mortgage Servicers of document mills using "Robo-Signers" to forge counterfeit signatures on thousands if not millions of Mortgage related documents for the sole purpose of foreclosing on Mortgages. Lost Notes, confusion over the actual ownership of the Promissory Note and Mortgage, and fabricated foreclosure documents with forged signatures have served as a "storm warning" to Americans of the foreclosure fraud epidemic, but not so much of the particulars concerning Mortgage fraud, and this Court must not turn a blind eye to the reality of the epidemic and what Plaintiff respectfully moves this Court for redress of the grievance created by the Defendant(s), and each of them, for remedy.

58.   During the years 2005 through 2009 millions of Americans, including Plaintiff, had no reason to suspect that the national Subprime Mortgage Industry created the Housing Bubble and the Mortgage Crisis through false misrepresentations and predatory lending. This is because the parties who conducted the widespread systematic Mortgage fraud alleged herein were presumably reputable and financially stable institutions which the Public at Large had been doing business with for years without incident; because during the last decade the government regulators did nothing to prosecute the wrongdoers; and because our government officials, told Americans that "the Banks may have ventured into the realm of moral hazard, but they did nothing illegal"; thus, giving our whole society the false impression that homeowners had no actionable injury.

59.   Additionally, during the years 2000 through 2006 the pattern of Subprime Mortgage Brokers and Originators pressuring Appraisers to inflate property Appraisals occurred on such a massive scale that such conduct resulted in the inflation of housing prices nationwide with entire housing markets becoming inflated, thereby obscuring from public view the individual acts of inflating Appraisals. (*See* S & P/Case-Shiller Home Price Indices, McGraw-Hill Financial, January 2012).

60.   Thus, during the years 2000 through 2009 millions of objectively reasonable Americans, including Plaintiff, were without being aware of the Inquiry Notice of actionable injury.

61. The first significant "storm warnings" to Americans of Mortgage lending fraud came in the testimony William K. Black before the House Financial Services

Committee on April 20, 2010. (*See* "Public Policy Issues Raised by the Report of the Lehman Bankruptcy").

62. In the April 20, 2010 hearing before the House Financial Services Committee, Black testified about the role that Alt-A Mortgages (what he called "Liar Loans") on residential Real Estate played in the downfall of Lehman Brothers. Black's testimony was that "Lehman's failure is a story in large part of fraud. And it is fraud that begins at the absolute latest in 2001, and that is with their Subprime and Liar's Loan operations." Black said that the occurrence of fraud in "Liar's Loans" was at 90 percent.

63. Black's credentials give credibility to his allegations of fraud conducted by Subprime Mortgage Lending institutions. Black explains his credentials to the House Financial Services Committee as follows:

"I begin with a short description of my background that is relevant to your questions. My primary appointment is in economics. I have a joint appointment in law. I am a white-collar criminologist. My research specialization is financial fraud by elites and financial regulation. I was senior regulator during the S&L debacle (and had the honor of testifying many times before this Committee). As a regulator, I was –

- The Litigation Director of the Federal Home Loan Bank Board. We had independent litigation authority. We were not represented by the Justice Department

- The Deputy Director of the Federal Savings and Loan Insurance Corporation (FSLIC)

- The Staff Leader of the re-regulation of the S&L Industry in 1984-1984

- The Senior Vice President and General Counsel of the Federal Home Loan Bank of San Francisco (FHLBSF)

- The Senior Deputy Chief Counsel for Enforcement and Litigation (West Region) of the Office of Thrift Supervision (OTS)

- The Deputy Staff Director of the National Commission on Financial Institution Reform, Recovery and Enforcement (NCFIRRE)

Several aspects of this background may be of particular use to the Committee.

- The Bank Board was both a safety and soundness regulator and Securities Regulator for publicly traded Savings & Loan Holding Companies. We were vigorous in bringing actions against those that abused the accounting rules.

- I (Black) worked extensively, and cooperatively with many other regulatory agencies.

- The Federal Home Loan Banks (before the passage of FIRREA in 1989) were similar to the Federal Reserve Banks. The FHLB's had Board of Directors dominated by industry members and had both a lending function and a regulatory function. We used the information gained through, and the leverage inherent in, the FHLBSF's lending activities to aid our and our sister agencies', supervisory effectiveness.

- We always made extensive referrals to the SEC, the FBI and the Department of Justice when we found evidence of unsafe and unsound practices or violations of law. I was one of the Officials charged with making sure that these referrals became far more effective. One result was that the government obtained over 1000 felony convictions of S&L insiders and those that aided and abetted their frauds.

64. The Public at Large first "storm warnings" came in 2010 with the Financial Crisis Inquiry Commission Report from Congress and in November 2011 when learning about William K. Black and his testimony before the House Financial Services Committee via the Internet.

65. When Plaintiff suffered financial difficulty from the depressed economy and began to be targeted by the Banks who purported held his Mortgage he sought legal assistance that was not amenable to his situation and he was compelled to investigate the possibilities of Mortgage fraud in his Mortgage Loan, which lead him to discover the fact that the Defendant Original Lender misrepresented the Value of Plaintiff's property in both Mortgages with Defendant Original Lender, where said Mortgage Loans were false and inflated.

66. On December 16, 2018, Plaintiff has secured a copy of the County Records assessment of the Value of the property for each Mortgage with the Defendant Original Lender for the year 2006.

67. Plaintiff (deeded owner, down payment provider, Mortgage payment remitter and other expenses of equitable interest), compared the representation that Defendant, Original Lender, used to create the Promissory Note and Mortgage dated March 24, 2006. Based upon the newly discovered evidence, Plaintiff has learned that he has an actionable injury in fact for Mortgage fraud involving a false an inflated Appraisal overstating the Fair Market Value of each of the Mortgages he/his interest was fraudulently induced into signing with Defendant Original Lender.

## IX. THE ALLEGED MISCONDUCT

68. Defendant Original Lender committed the offence of Mortgage fraud, with the intent to defraud, in violation of New York State Penal Law § 187(4), *i.e.*, "Residential Mortgage Fraud is committed by a person who, knowingly and with intent to defraud, presents, causes to be presented, or prepares with knowledge or belief that it will be used in soliciting an applicant for, applying for, underwriting or closing a residential Mortgage Loan, or filing with a County Clerk of any County in the state arising out of and related to the closing of a residential Mortgage Loan, any written statement which:

(a) Contains materially false information concerning any fact material thereto; or

(b) Conceals for the purpose of misleading, information concerning any fact material thereto.

(c) Criminal Statutes and New York Banking Law Article 2 § 30 -"Consummation of Mortgage Loans", *i.e.*, the term 'consummation of a Mortgage Loan' means, for purposes of the act of Congress entitled 'Truth in Lending Act' and the regulations thereunder and the Real Estate Settlement Procedures Act (RESPA) of 1974, as amended, and the regulations thereunder, when the Promissory Note and Mortgage including by electronic signature, in accordance with applicable federal and state laws, rules and regulations."

(d) New York State General Business Law § 349 – for injunctive relief against deceptive practices through for Mortgage Fraud, *i.e.*, 'Deceptive Acts and Practices Unlawful' –

A) Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful.

B)  Whenever the Attorney General shall believe from evidence satisfactory to him that any person, firm, corporation or Association or Agent or employee thereof has engaged in or is about to engage in any of the acts or practices stated to be unlawful he may bring an action in the name and on behalf of the people of the state of New York to enjoin such unlawful acts or practices and to obtain restitution of any moneys or property obtained directly or indirectly by any such unlawful acts or practices. In such action preliminary relief may be granted under Article 63 of the Civil Practice Law and Rules (CPLR)…

G) This section shall apply to all deceptive acts or practices declared to be unlawful, whether or not subject to any other law of this state, and shall not supersede, amend or repeal any other law of this state under which the Attorney General is authorized to take any action or conduct any inquiry.

H) In addition to the right of action granted to the Attorney General pursuant to this section, any person who has been injured by reason of any violation of this section may bring an action in his/her own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions. The Court may, in its discretion, increase the award of damages to an amount not to exceed three (3) times the actual damages up to one hundred thousand dollars, if the Court finds the Defendant willfully or knowingly violated this section. The Court may award reasonable Attorney's fees to a prevailing Plaintiff.

69.  To state a cause of action for fraud in the inducement, a Plaintiff must allege the following:

a)  A misrepresentation of a material fact;

b) That the Representor knew or should have known of the statement's falsity;

c) That the Representor intended that the representation would induce another to rely on it; and

d) That the Plaintiff suffered injury in justifiable reliance on the representation.

70. In accordance with the foregoing facts and law delineated by Plaintiff regarding violations of federal statutes specified herein, and in accordance with the facts and law delineate by Plaintiff regarding violations of NYS Law that Plaintiff affirmatively alleges that the Defendant Original Lender fraudulently misrepresented the true value of the property that induced Plaintiff to agree being a co-buyer of a contract for a Mortgage Loan, as follows:

(1) Defendant Original Lender misrepresented the Value of the subject property based upon an inflated Appraisal which overstated the Value of the subject property based upon an inflated Appraisal which overstated the Value of the property, and Defendant Original Lender misrepresented the risk to Plaintiff of Loan default and Mortgage foreclosure by understating the Loan-to-Value Ratio in the Loan documents;

(2) Defendant Original Lender knew or should have known that these representations were false;

(3) Defendant Original Lender had a duty to truthfully represent the Value of the Plaintiff's properties and Defendant Original Lender violated that duty by using a false and inflated Appraisal overstating the Value of the subject property(s) to justify the Loan amount at the Mortgage contract closing.

(4) Defendant Original Lender falsely overstated the Value of the property(s) in the Loan documents.

(5) Defendant Original Lender falsely understated the Loan-to-Value Ratio in the Loan documents, thereby misrepresenting to Plaintiff the risk of loan default and Mortgage foreclosure.

(6) Plaintiff would not have agreed to be a co-buyer of the Mortgage for the subject property with these misrepresentations by Defendant Original Lender had Plaintiff known and understood the nature of these misrepresentations in the Loan documents.

## X.  THE BASIS OF ALLEGED LIABILITY

71. Defendant(s) Original Lender's false representation are the actual and proximate cause of damages to Plaintiff.

72. The United States Court of Appeals for the Sixth Circuit explains Plaintiff's theory of damages in the case of *In re*: *Sallee*, 286, F. 3d 878 (2002), as follows: "In Kentucky, when a party in induced by a fraudulent misrepresentation to enter into a contract, that party must elect to either – (1) affirm the contract and recover damages in tort for the fraud; or (2) disaffirm the contract and recover the consideration with which he has parted. (*H.C. Hanson v. Am. Nat'l Bank & Trust Co*., 865 S.W. 2d 302, 306 [Ky., 1993]; The election required is between the available remedies – either affirming the contract and claiming damages or rescinding the contract. (Sanford Constr. Co. v. S & H Contractors, Inc., 443 S.W. 2d 227, 236 [Ky., 1969]; Under Kentucky law, as found by the majority, the *Sallees* may recover the difference between the Value of the property as it was fraudulently represented and the actual Value of the property. (*Dempsey v. Marshall*, 344 S.W. 2d 606, 607 [Ky., 1961]).

73. For Plaintiff, rescission of contract is not a meaningful remedy in the context of the Defendant(s) predatory scheme of inducing Plaintiff to sign a Promissory Note and Mortgage exceeding the Value of the subject property. Plaintiff therefore elects to affirm these contracts and recover damages in tort for the fraud.

74. Accordingly, Plaintiff seeks to recover the difference between the Value of the subject property as it was fraudulently represented and the actual Value of the property(s) at the time of the signing of the Loan and Mortgage contracts.

75. Defendant(s) Original Lender represented the Value of the subject property(s) at the time of the signing of the Loan and Mortgage documents as $715,00.00 for the property's located at 360 East Grand Street, Mt. Vernon, New York 10552.

76. The property Appraiser for Westchester County in New York assessed the Value of the subject property identified herein as during the year 2006 as $621,405.75 and was purchased by Plaintiff on August 9, 2006 for $715,000.00. (*See* Exhibit "2", the Final Assessment Roll for Taxable Status Date August 9, 2006).

77. The Notice of Property Value of the Plaintiff's property is a Public Legal Appraisal reflecting the government's position of the actual Fair Market Value of the property during the particular year at issue in this Complaint, upon which the County property taxes are assessed. This government assessment of the Value of the property is consistent with the 110-year mean for housing prices, as adjusted for inflation of the currency.

78. Defendant(s) Original Lender's representation of the value of the subject property is inflated and egregiously above the amount of the New York Westchester County Property Notice of Property Assessment Value Report (*See* Exhibit "2").

79.  The difference between the Mortgage amount of $715,000.00 and the Notice of
Property Assessment Value Report for the subject property in August 2006 of
$621,405.75 makes the actual damages Plaintiff was injured being $93,594.25. This
amount is allowed to be tripled under Civil R.I.C.O. remedies and accrues to
$280,782.75.

80.  The Mortgage Loan is called the "benefit of the bargain", which must be repaid
when affirming the contract and claiming damages for fraud in the inducement.

81.  The balance of the Loan amount is set off from the R.I.C.O. damages and
credited to any existing Mortgage Loan balance.

82.  The Loan amount to Plaintiff was $715,000.00 .00 respectively.

83.  The balance of the Loan in the amount is to be subtracted from the fraudulently
induced Mortgages to determine Civil R.I.C.O. damages as a set-off, thereby
satisfying the Mortgages.

84.  Defendant(s), and each of them, are liable to Plaintiff for treble damages from the
fraudulently misrepresented Mortgages, minus the Mortgage Loan amount together
with Satisfaction of Mortgage.

## XI. THE ALLEGED WRONGDOERS

85.  The Liar's Loan Enterprise is a subset of the national Subprime Mortgage
Industry, including all of the top executives of the top Subprime Mortgage
Originators, the top Subprime Mortgage-Backed Securities Issuers, the top Subprime
Mortgage Servicers, the National Appraisal Management Companies, the nationwide
network of Mortgage Brokers, certain institutional investors, and Federal Reserve
Chairmen Alan Greenspan and Ben Bernanke who played a significant role in the

creation of millions of predatory Loans originated nationwide between the years 1997 through 2008.

86.   The pattern conducted by these Subprime Mortgage Originators of using a false and inflated Appraisal overstating the property Value to misrepresent the Loan-to-Value Ratio in Mortgage Loan Documents has been occurring continuously from 1997 to the present time and has every indication of continuing into the future. (*See* J. Kevin Murry, "Issues in Appraisal Regulation: The Cracks in the Foundation of the Mortgage Lending Process, Loyola of Los Angeles Law Review, June 2010).

87.   In "Lenders Put the Lies in Liar's Loans and Bear the Principal Moral Culpability", William K. Black, New Economic Perspectives (October 2011), Black explains who is culpable:

The Fraud "Recipe" for Lenders –

"The reason that accounting control frauds characteristically engage in lending behavior that no honest lender would exhibit was that these perverse practices maximized reported short-term income and the executive's compensation. There is a four-ingredient fraud "recipe" for lenders:

1.   Extreme growth through making exceptionally bad Loans at a premium yield (very high interest rate) which economists referred to as the "Housing Bubble".

2.   These resources include the "Securitization" of consumer debt, which made available to the Mortgage lending industry hundreds of billions of dollars annually of "other people's money" and a new "originate and sell" paradigm within the consumer lending industry;

3. thousands of property Appraisers who acquiesced to inflating Appraisals under "meet the numbers" in the Loan documents (or be blacklisted) pressures by Mortgage lenders and their Brokers; and a hungry market of renters and homeowners who exhibited "irrational exuberance in their receptivity to mortgaging and refinancing their way into achieving the American Dream.

4. Defendant Original Lender participated in the Liar's Loans Enterprise affairs through a pattern of racketeering activity involving the brokering, originating, bundling, selling into the Secondary Market, Servicing, and foreclosing on Liar's Loans made with inflated, overrated, false Appraisal of the subject property(s).

## XII.    THE R.I.C.O. PATTERN

88. On September 21, 2010, William K. Black testified before the Financial Crisis Commission about the role of fraud in the financial crisis. In his overview of his key findings, Black effectively outlined the pattern of racketeering activity conducted by the Liar's Loans Enterprise during the years 2001 through 2008, wherein the top executives within the national Subprime lending industry operated their organizations as control frauds by making intentionally bad loans at premium yield to produce extreme growth, coupled with extreme leverage and grossly inadequate loss reserves, to produce executive compensation -- at the expense of the company and society as a whole. (*See* Testimony Before the Financial Crisis Commission, Miami, Florida, September 21, 2010).

89. There is no ***honest*** reason why a Mortgage lender would inflate the appraised
Value and size of the loan. Causing or permitting large numbers of inflated
Appraisals is a superb "marker" of accounting control fraud by the lender because
the senior officers directing an accounting control fraud do maximize short-term
reported (fictional) income (and real losses) by inflating Appraisals and stated
income. Lenders and their Agents frequently suborned Appraisers by deliberately
creating a Gresham's dynamic to try to induce them to inflate market values,
leaked the Loan amount to the Appraisers, drove the Appraisal fraud, and made it
endemic. A national poll of Appraisers in early 2004 found that 75% of
respondents reported being subjected to coercion in the last 12 months to inflate
Appraisals. A follow up survey in 2007 found that the percentage that had been
subjected to coercion had risen 90%. Appraisers reported that when they refused
to inflate Appraisals 68% had lost at least one client and 45% were not paid for at
least one Appraisal in the prior 12 months.

    XIII.       FAILURE TO PROVIDE VALUE TO FUND THE MORTGAGE

90. Defendant Original Lender did not provide any money to fund the fraudulently
induced "Liar's Loan".

91. Plaintiff gave the Defendant Original Lender money for the down payment of the
fraudulently inflated Mortgage and signed a Promissory Note to commit to the
performance and obligation of the Mortgage, which was in fact, the only currency
exchanged between Plaintiff and Defendant Original Lender in the purported
Mortgage Loan transaction at the inception of the Mortgage.

92. The Defendant Original Lender got Plaintiff's down payment and Promissory Note without loaning Plaintiff anything of Value to attach to the security in violation of U.C.C. § 9-203(b).

93. The Defendant Original Lender deposited Plaintiff's Notes into a transactional checking account and did not tell Plaintiff as the depositor of said checking account where Plaintiff's Note was deposited, he was the Creditor of the money they deposited in an account in Plaintiff's name.

94. **NO LOAN EVER TOOK PLACE.** The Defendant Original Lender exchanged a check of equal value from an account which they deposited the Note Plaintiff signed, so neither Defendant Original Lender actually put up any of their own money to fund the purported Mortgage and Note.

95. The Defendant Original Lender had no right to sell Plaintiff's Mortgage and Note because the Plaintiff's Note was deposited into an account in Plaintiff's name, and the money to fund the Mortgage was withdrawn from that account without Plaintiff's authorization.

96. The Seller of the property received a check. The money deposited for the check came from the Plaintiff's Note that was deposited as a Cash Item on the Defendant Original Lender's books. Therefore, the Defendant Original Lenders had no right to the Plaintiff's Mortgage and Promissory Note until they contributed Value to those instruments to attach any claim or right to Plaintiff's property.

97. The Defendant Original Lender never consummated the Loan but kept Plaintiff's Mortgage and Promissory Note and transferred the equitable interests of Plaintiff's property to their Successors, Assigns, and Agents who have obtained a benefit from

the Defendant Original Lender's fraudulent inducement of the Mortgage Loan, and fraud in the factum of failing to put up anything of Value to attach to the Plaintiff's property.

98. Courts, while refusing to maintain any action upon the unlawful contract have always striven to do justice between the parties, so far as could be done consistently with adherence to law, by permitting property or money, parted with on the faith of the unlawful contract, to be recovered back, or compensation to be made for it. In such case, however, the action is not maintained upon the unlawful contract, nor according to its terms; but on an implied contract of the Defendant to return, or, failing to do that, to make compensation for, property or money which it has no right to retain. To maintain such an action is not to affirm, but to disaffirm, the unlawful contract.

99. "When a contract is once declared *ultra vires*, the fact that it is executed does not validate it, nor can it be ratified so as to make it the basis of suitor action, nor does the Doctrine of Estoppel apply." (*F & PR v. Richmond*, 133 SE 898; 151 Va. 195).

100. "A national bank…cannot lend its credit to another by becoming a surety, indorser or guarantor for him. Such an act; is *ultra vires*…". (*Merchants Bank v. Baird*, 160 F. 642).

XIV. THE QUESTION OF LAWFUL VALUE AND CONSIDERATION

101. The issue of whether the lender who writes and passes a "bad" check or makes a "credit" loan has a claim for relief against the Borrower is easy to answer, providing that the lender can prove that he gave a lawful consideration, based upon lawful acts. But, did the lender give lawful consideration? To give a lawful

consideration, the lender must prove that he gave the borrower lawful money such as coins or currency. Failing that, he can have no claim for relief in a Court of law against the Borrower as the lender's actions were *ultra vires* or void form the beginning of the transaction.

102.     The question of valuable consideration in this instant action, does not depend on any Value imparted by the lender, but the false confidence instilled in the Plaintiff by the Defendant Original Lender to induce him into believing the Appraisal of the Mortgaged properties and that they actually loaned Plaintiff any Valuable consideration in exchange for the money and Promissory Notes Plaintiff remitted in good faith. It seems unconscionable that a Bank or lender would ask Borrowers to put up money and pledge obligation to a debt as collateral for a "Credit Loan" that the Bank or lender never contributed Value in the performance of their claim to the security instruments which they claim a right to lien.

103.     Should a Court of law or equity allow a perpetrator of fraud to enforce a claim with which they misrepresented the Value or failed to perform their contribution of Value to have a lawful claim? Were the Court to do so, it would be contrary to all principles of law.

104.     The argument that the Borrower received the property for the lender's false representations gives the lender a claim or right for enforcement or relief is not valid, unless the lender can prove that he gave lawful Value to the security. The Bank or lender does not Loan its money, only the credit it receives from the Borrower in the amount of the Promissory Note which is nothing more than an accounting transaction on the Bank or lender's books. Hence, no *prima facie* injury exists to the Bank or

lenders upon the mere proof that they hold the Mortgage and Promissory Note in their possession. "A perfect obligation is one recognized and sanctioned by positive law; one of which the fulfillment can be enforced by the aid of law. But, if the duty created by the obligation operates only on the moral sense, without being enforced by a positive law, it is called an "imperfect obligation", and creates no right of action, nor has it any legal operation. The duty of exercising gratitude, charity, and the other merely moral duties are examples of this kind of obligation." (*Edwards v. Keaney*, 96 U.S. 595, 600; 24 L. Ed. 793).

105.      When there is no consideration in jeopardy of being returned, then the obligation is to make the Bank or lender injury proof, to the extent of the obligation, which would be to make them whole. The only obligation is based upon the moral issue, which under the law, is an Imperfect Obligation, to return to them their property, which isn't wealth, but credit. A Promissory Note is signed under "economic compulsion" when, the "Loan" will not be consummated unless and until the Borrower signs it. Thus, performing the act of signing a Promissory Note cannot be considered voluntary.

106.      "When a contract is once declared *ultra vires*, the fact that it is executed does not validate it, nor can it be ratified so as to make it the basis of suitor action, nor does the doctrine of estoppel apply." (*See F& PR v. Richmond,* 133 SE 898; 151 Va. 195).

107.      "A national bank ... cannot lend its credit to another by becoming surety, indorser, or guarantor for him, such an act; is *ultra vires*..." (*See Merchants' Bank v. Baird*, 160 F 642).

108.    Plaintiff has reason to believe, upon personal knowledge involving the facts surrounding the Mortgage transaction, that the down payment and Promissory Note remitted to the purported Original Lender at the inception of said Mortgage transaction was the only form of currency the Defendant Original Lenders used to fund the purchase of the subject property, and therefore no attachment and enforceability was perfected against the Plaintiff's security instruments. This financial industry practice of using the Borrower's Note as the funding instrument of the "Liar's Loan" agreement, is explicitly explained in the Federal Reserve Publication titled "Modern Money Mechanics", printed by the Federal Reserve Bank of Chicago in 1992, and the "Affidavit of Walker Todd", an expert witness for Defendants in the BANK ONE, N.A. v. HARSHAVARDHAN DAVE and PRATIMA DAVE State of Michigan case in the Circuit Court for the County of Oakland, Case No. 03-047448-CZ. (*See* Exhibit "3").

109.    According to the Federal Reserve Bank's Book of Richmond, Virginia, title "Your Money" on page seven is states: "…demand deposit accounts are not legal tender…". If a Promissory Note is legal tender, the Bank must accept it to discharge the Mortgage Note. The Bank or lender changed the currency from the Promissory Note they deposited into a Bank Check (liability the Bank owes for the Mortgage Note they deposited).

110.    Plaintiff affirmatively alleges that the Defendant Original Lender perpetrated fraud in the *factum* at the inception of the fraudulently induced Mortgage Loan by not providing Value to attach to Plaintiff's property because they did not provide funding for the purported "Liar's Loan" agreement Plaintiff was fraudulently

induced into agreeing, and therefore have no right or claim to enforce in any Court of competent jurisdiction.

## COUNT I

### 18 § 1964(c) R.I.C.O. VIOLATIONS INVOLVING MORTGAGE FRAUD

111.    Plaintiff re-asserts the statements delineated in the foregoing paragraphs 1 through 110 as though incorporated here to allege the fact that the Defendant(s), Original Lender misrepresented the Appraisal Value of the Plaintiff's subject property of this Complaint and have perpetrated the misrepresentation through an enterprise which is prohibited under 18 U.S.C. § 1964(c).

112.    Plaintiff affirmatively asserts the fact that the Defendant(s), Original Lender transferred, assigned or sold Plaintiff's Mortgage and Note without Plaintiff's knowledge and consent to put Plaintiff at a usurious disadvantage to other Defendant(s), and each of them, who do not have a lawful right or claim to make against Plaintiff's Mortgage, Promissory Note and property.

## COUNT II

### VIOLATIONS TO SECTION 1962(a) OF R.I.C.O.

113.    Plaintiff re-asserts the statements delineated in the foregoing paragraphs 1 through 112 as though incorporated here to allege the fact that the Defendant(s), and each of them, have engaged and benefitted from a corrupt enterprise to defraud homeowners over a period of more than twenty (20) years that has adversely impacted the Plaintiff and the American people as a whole for fraud in the sale of Mortgages, Promissory Notes and Securities.

114.     Plaintiff has suffered injury from the duplicitous inducement of the subject

properties of this Complaint from the loss of equity and Loan-to-Value Ratio usury.

COUNT III
DECEIT ("DOLO") IN THE FULFILLMENT
OF CONTRACTUAL OBLIGATIONS
(Fraud in the Factum)

115.     Plaintiff re-asserts the statements delineated in the foregoing paragraphs 1

through 114 as though incorporated here to allege the fact that the Defendant(s),

Original Lender failed to provide Value to attach to the Plaintiff's Mortgage and

Promissory Note at the inception of the Mortgage transaction and therefore

perpetrated fraud in the *factum* of the purported Loan agreement.

116.     As a result of Defendant Original Lender's fraudulent acts Plaintiff has

suffered financial hardship, mental anguish and emotional distress trying to maintain

a debt Plaintiff never owed.

**WHEREFORE** Plaintiff, Gayon Clarke, (deeded owner, down payment provider,

Mortgage payment remitter and other expenses of equitable interest),  demands

judgment against the Defendant(s), and each of them, for actual, consequential,

compensatory, and potential damages, together with the *vacatur* of final foreclosure

judgments, discharge of any *lis pendens* filed against Plaintiff's property by any

adverse Party-in-Interest, Satisfaction of Mortgage and Mortgage Release,

cancellation of the Promissory Note; permanent injunction against all Defendant(s),

Successors, Assigns and Agents who try to enforce a claim or judgment that has been

fraudulently procured in violation of the 18 U.S.C. § 1964(c),  and U.C.C. § 9-203(b).

Plaintiff also demands to be compensated for attorney's fees pursuant to the Mortgage

Loan documents based on reciprocity of contracts, that the Court uphold the

Constitutions of the United States of America, New York State and provisions of law under Common Law fraud, with strict scrutiny enforcement of provisions of law under New York State Penal Law § 187, *et. seq.* -- for Mortgage Fraud Criminal Statutes, New York Banking Law Article 2 § 30, Article 63 of the Civil Practice Law and Rules (CPLR), "to obtain restitution of any moneys or property obtained directly or indirectly by any such unlawful acts or practices," New York State General Business Law § 349 -- for injunctive relief against deceptive practices and 18 U.S.C. § 1964(c), including sanctions for raising unsupported claims or defenses, and damages for delays in litigation; repair of any damage to Plaintiff's credit history, interest, costs.

Plaintiff demands relief from the egregious fraudulent acts of the Defendant(s) and each of them in the treble damages amount of $278,000.00, and $1,722,000.00 for emotional distress, mental anguish, economic hardship, public dishonor, and interest for a total amount of $2,000,000.00, as well as a Mortgage and Promissory Note Set-Off an/or Mortgage release, and such other and further relief as to the Court seems just and proper.

Further, Plaintiff demands trial by jury on all issues triable by jury and reserves the right to amend this Complaint to include unknown parties or for perfecting of pleadings.

Date: February 11, 2019.
New York State, Westchester County.

Respectfully,

Grayon Clarke
360 Grand Street
Mt. Vernon, New York
Non-Domestic [105520]

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FILED
FEB 13 2019
USDC

19 CV 01381

Gayon Clarke,

Plaintiff,

*Standing in propria persona, Sui juris*

-against-

WMC MORTGAGE CORP.;
MORTGAGE ELECTRONICS REGISTRATION
SYSTEMS, INC. (MERS). AS "NOMINEE" FOR
FIRST WMC MORTGAGE CORP.; GENERAL
ELECTRIC, Parent Company for WMC MORTGAGE
CORP.; MIT LENDING; GMAC MORTGAGE
CORP., OCWENS LOAN SERVICING LLC, Parent
Company for LITTON LOAN SERVICING;
RESIDENTIAL FUNDING REAL ESTATE
HOLDINGS LLC; RESCAP SECURITIES
HOLDINGS CO.; LOANCARE LLC;
SERVICELINK; ALTISOURCE; STEVEN J. BAUM
P.C., STANLEY E. ESPOSITO, PITNICK &
MARGOLIN, LLP; THE MARGOLIN & WEINREB
LAW GROUP, LLP; LAW OFFICES OF ALAN
WEINREB, PLLC; FEIN SUCH & CRANE, LLP;
RAS BORISKIN, LLC; DURANTE BOCK & TOTA,
PLLC; JOHN DEMERLE; LUCIA ANN FILANCIA;
and JOHN "DOES" and JANE "DOES", 1 through 100.

Defendant(s).

Case
No.

**VERIFIED
CIVIL
R.I.C.O.
COMPLAINT
PURSUANT
TO 18 U.S.C. §
1964(c)**

JURY TRIAL
DEMANDED

February 11,
2019

TO THE SUPREME COURT OF THE STATE OF NEW YORK   }
                                                  } ss:
COUNTY OF WESTCHESTER                             }

## LIS PENDENS

**PLEASE TAKE NOTICE** that this action was commenced in the above named Court by the above entitled Plaintiff against the above entitled Defendant, and is now pending.

The Petitioner(s) assert and affirm a Real Property Claim affecting the Real Property located at 360 Grand Street, Mt. Vernon, New York [10552] Non-Domestic.

The land referred to herein is situated in the County of Westchester, State of New York, and bears the legal description as follows: **SEE ATTACHED SCHEDULE [A]**

_____

_____

_____

Dated:_____, 2019                  Respectfully Submitted,

                                             Gaylon Clarke
                                             360 Grand Street
                                             Mt. Vernon, New York
                                             Non-Domestic [105520]

cc:

WMC MORTGAGE CORP
3100 Thornton Avenue, Office 344,
Burbank, CA 91504.

MIT LENDING
33 Maiden Lane, 6th Floor
New York, New York 10038.


LITTON LOAN SERVICING LP
4828 Loop Central Drive, Suite 151
Houston, TX 77081.

RESIDENTIAL FUNDING REAL ESTATE HOLDINGS LLC
2255 N. Ontario Street
Burbank, CA 91504.

OCWENS LOAN SERVICING LLC
1661 Worthington Road, Suite 100
West Palm Beach, FL 33409.

RESCAP SECURITIES HOLDINGS CO.
8300 Norman Center Drive, Suite 170
Bloomington, MN 55437;

*and*

RESCAP SECURITIES HOLDINGS CO.
225 Liberty Street
New York, NY 10286.

LOANCARE LLC
3637 Sentara Way,
Virginia Beach, VA 23452;

*and*

LOANCARE LLC
P.O. Box 8068
Virginia Beach, VA 23450.

ALTISOURCE
1000 Abernathy Road NE, Suite 200,
Atlanta, GA 30328.

SERVICELINK
1355 Cherrington Parkway
Moon Township, PA 15108.

STEVEN J. BAUM P.C.
220 Northpointe Parkway
Amherst, NY 14228;

*and*

STEVEN J. BAUM P.C
Attn:  John Demerle
P.O. Box 1291
Buffalo, NY 14240-1291.

PITNICK & MARGOLIN, LLP
6800 Jericho Turnpike, #206W
Syosset, New York 11791.

THE MARGOLIN & WEINREB LAW GROUP, LLP
165 Eileen Way, Suite 101
Syosset, New York 11791.

LAW OFFICES OF ALAN WEINREB, PLLC
165 Eileen Way, Suite 101
Syosset, New York 11791.

FEIN SUCH & CRANE, LLP
1400 Old Country Road, Suite C103
Westbury, New York 11590.

RAS BORISKIN, LLC
900 Merchants Concourse
Westbury, New York 11590.

MORTGAGE ELECTRONICS REGISTRATION SYSTEMS, INC. (MERS)
1818 Library Street, Suite 300
Reston, VA 20190.

GENERAL ELECTRIC
Easton Turnpike
Fairfield, CT 06828;

*and*

GENERAL ELECTRIC
41 Farnsworth Street
Boston, MA 02210.

DURANTE BOCK & TOTA, PLLC
2000 Maple Hill Street, Suite 206
Yorktown Heights, New York 10598.

LUCIA ANN FILANCIA
6 Kniffen Road
Katonah, NY 10536.

VERIFICATION

I am the Petitioner in this action. I have read the foregoing Petition and it is true of my own knowledge, except as to those matters stated on information or belief, and as to those matters, I believe it to be true.

I declare under penalty of perjury, under the laws of the State of New York, that the foregoing is true and correct.

Date of Execution:_____

_____
Petitioner

_____
Notary